[Criminal No. 371.   Filed February 26, 1917.]

[163 Pac. 259.]

## HARRY BABB and LEON PHILLIPS, Appellants, v. STATE, Respondent.

1. CRIMINAL LAW—INSTRUCTIONS—CREDIBILITY OF IMPEACHING TESTIMONY.—In prosecution for stealing horses, where impeaching testimony was taken, it was error to instruct that the testimony of impeaching witnesses should be weighed in the same manner as that of other witnesses, and, when impeaching witnesses attack the credibility of others and testify falsely, the jury might disregard entirely the impeaching testimony in so far as false and give to the testimony of the witnesses attacked such weight and credence as is deserved.

2. CRIMINAL LAW — INSTRUCTION — CREDIBILITY OF WITNESS.—An instruction to disregard false testimony must be conditioned on the witness willfully or knowingly swearing falsely, and the omission of the qualifying words "willfully and corruptly" is error.

3. CRIMINAL LAW — INSTRUCTION.—In prosecution for horse-stealing, instruction that if testimony of a witness, naming him, had been attacked through bias, and that if beyond a reasonable doubt such witness testified truthfully, his testimony should have the same

weight and credence as that of any other witnesses, was erroneous
and prejudicial as singling out the testimony of a single witness
and giving undue prominence to an isolated fact.

4. CRIMINAL LAW — PROVINCE OF JURY — WEIGHT OF TESTIMONY.—In
prosecution for horse-stealing, instruction that positive evidence of
one credible witness is entitled to more weight than the testimony
of several witnesses who testify negatively or to collateral circum-
stances is erroneous, as invasive of the jury's province to determine
the weight of evidence.

5. CRIMINAL LAW—CONDUCT OF JURY—READING NEWSPAPERS.—Under
Penal Code of 1913, section 1063, providing that the jury may be
placed in charge of officer, whose duty it is to keep jurors together
until reconvention of court, to suffer no person to speak to them,
nor to do so himself on any subject connected with the trial, and
section 1064, requiring the jury to be admonished not to converse
among themselves on any subject connected with the trial, or to
anyone else, or to form or express any opinion until the cause is
finally submitted, it was error to permit one juror to have in his
possession and read to the others a newspaper account, reciting a
former charge of larceny against one of the defendants.

[As to reading of newspapers by jury during trial as ground for
setting aside verdict, see note in Ann. Cas. 1915C, 962.]

APPEAL from a judgment of the Superior Court of the
County of Maricopa. John C. Phillips, Judge. Reversed and
remanded.

#### STATEMENT OF FACTS BY THE COURT.

The appellants ask for a reversal of this case on the ground
that the court misdirected the jury as to the law and for
misconduct of the jury. The instructions complained of
are as follows:

"(1) Where witnesses have appeared and sworn to mat-
ters tending to impeach the veracity of other witnesses, you
will judge and weigh the testimony of said impeaching wit-
nesses in the same manner as that of any other witness, and
when such witnesses have attacked the credibility of any other
witness and you believe from all the evidence in this case
that said impeaching witnesses have testified falsely, you may
disregard entirely such impeaching testimony as appears to
you to be false, and give to the testimony of the witnesses
who have been attacked such weight and credence as you
believe he deserves.

"(2) And I charge you, gentlemen of the jury, that if you believe that the testimony of the witness Dean Becker has been attacked by witnesses through prejudice and bias or some special interest in this case, you may consider that fact in determining how much weight and credence you will give to the testimony of said impeaching witnesses, and I' charge you, further, that in considering the testimony of said witness Dean Becker you should take into consideration all the surrounding facts and circumstances, and in connection therewith, and taking into account the probability or improbability of the truth of his story, and if from all the evidence, facts and circumstances brought out on this trial it appears to you beyond a reasonable doubt that the said witness Dean Becker has testified truthfully, then you should give his testimony the same weight and credence as any other witness.

"(3) The positive testimony, gentlemen of the jury, of one credible witness to a fact, which in the light of all other evidence in the case appears reasonable and believable, is entitled to more weight than the testimony of several witnesses, equally credible, who testify negatively, or to collateral circumstances merely persuasive in their character from which a negative may be inferred."

(4) The misconduct of the jury is presented in the form of an affidavit of one of the appellants upon motion for a new trial. In the affidavit it is stated that the trial of the cause was begun on the twelfth day of February, 1914, and continued from day to day until the afternoon of the nineteenth day of February, when the case was finally submitted to the jury; that the verdict of guilty was returned on the twentieth day of February; that the jury was ordered to be kept together, that officers were sworn to take charge of it and keep it together during the trial; that on the nineteenth day of February, 1914, a certain article was published in the "Arizona Republican" purporting to relate certain facts of and concerning the commission of the offense charged, and that the following statement appearing in said article, among others, to wit:

"Phillips has formerly been in trouble in Yuma, where it is alleged he embezzled several dollars from a former em-

ployer and was saved from the penitentiary only because he made good on the cash taken.''

That the things contained in said statement were not presented to the jury in the course of the trial, either before or after the above publication, in any other manner than through the newspaper; that on the day of its publication and while the case was still pending before the jury a copy of the ''Arizona Republican,'' containing said article, came into the possession of the jury, and that they and each of them read said article; that one of said jurors read said article aloud to the other jurors while they were being held together, and before they had arrived at the verdict.

Messrs. Alexander & Christy, for Appellants.

Mr. Wiley E. Jones, Attorney General, and Mr. George W. Harben and Mr. R. W. Kramer, Assistant Attorneys General, for the State.

ROSS, J. (After Stating the Facts as Above.)—1. The appellants were charged with stealing five head of horses. The evidence relied upon by the prosecution for conviction was both direct and circumstantial, and both the prosecution and defense introduced a great deal of impeaching evidence. Just why it was thought necessary by the court to limit the application of the rule ''*Falsus in uno, falsus in omnibus*,'' to the impeaching testimony it is difficult to determine. Certainly the basis for such an instruction does not exist in this record, as there was a sharp and irreconcilable conflict in the direct evidence of the witnesses, as well as in the impeaching evidence. We see no reason why the application of this principle of law should have been restricted to one fragment of the testimony instead of the whole testimony.

The first instruction is subject to further criticism, in that it omits the element of knowledge or willfulness. ''An instruction to disregard false testimony must be conditioned on the witness willfully or knowingly swearing falsely, and the omission of the qualifying words 'willfully and corruptly' is error.'' Blashfield's Instructions to Juries, § 383. The jury ought not to be advised that they may disregard the testimony of a witness who has testified falsely to one fact or in

respect to one fact, for the reason that the rest of his testimony may be true and fully supported by credible corroboration. The instruction calls the attention of the jury to their right to disregard the impeaching testimony when it appears to be false, and at the same time enjoins on them the duty of weighing the impeached or attacked evidence. The same rule should be applied to both; neither should be given prominence over the other.

2. The appellants say that the second instruction is erroneous—''because the evidence in the case was conflicting, and the court in said instruction singled out the witness Becker for the prosecution in the instruction, and made the acquittal of the defendants depend upon whether or not the jury believed him.''

The vice in the first instruction is greatly intensified by the language of this instruction, for, in addition to directing the jury's attention to particular facts and phases of the testimony, this instruction singles out the most important witness for the prosecution, and practically tells the jury that if they believe his testimony, they should convict the appellants. Becker had testified that he lived at the home of appellant Babb; that he had seen the stolen horses in Babb's field; that he had assisted the appellant Phillips at night in taking the horses out of the field and removing them some twelve or fifteen miles therefrom in order to avoid detection. Both of the appellants deny this, and several witnesses for the defense testify that at the time mentioned the horses were not in appellants' possession or field. The importance of Becker's testimony is apparent—should the jury believe it, there were circumstances in the case that made the appellants' guilt inevitable.

The instruction, after directing the jury's attention to the possible bias and prejudice or special interests of the witnesses whose testimony conflicted with Becker's, advised them that if they believed Becker beyond a reasonable doubt, they ''should give his testimony the same weight and credence as any other witness.'' Of course the ''weight and credence'' given to any witness believed ''beyond a reasonable doubt'' is absolute verity. In effect, therefore, the jury were told that if they believed Becker, they should convict the appellants. It is hard to imagine an instruction more damaging

or prejudicial than this one. In 12 Cyc. 649, the rule is stated as follows:

"The court should be careful in charging the jury and stating the evidence not to give undue prominence to any phase or facts which the evidence tends to establish, but to leave the jury to determine its weight and importance. It is therefore proper to refuse, and generally error to give, an instruction which singles out or emphasizes particular parts of the evidence or gives undue prominence to isolated facts, or which directs the attention of the jury to a particular fact among a great number of facts. An instruction which singles out certain witnesses and makes an acquittal depend upon whether or not the jury believe them is error where the evidence is conflicting. So the court cannot select a particular witness, or class of witnesses, and instruct that if the jury believe he, or they willfully testified falsely as to any material fact, they may reject or distrust all their evidence."

The instruction gave undue prominence to "an isolated fact," the testimony tending to impeach Becker and to "a particular fact among a great number of facts." It singled out a certain witness and made the acquittal of appellants depend upon his testimony; the evidence being conflicting. In *Schutz* v. *State*, 125 Wis. 452, 104 N. W. 90, the court said:

"It is not proper for the court to select one witness from several and apply to him or his testimony exclusively rules of consideration equally applicable to others." 38 Cyc. 1680; *Loose* v. *State*, 120 Wis. 115, 97 N. W. 526; *Wastl* v. *Montana Union Ry. Co.*, 17 Mont. 213, 42 Pac. 772.

3. In the third instruction the court clearly comments upon the weight of the testimony, wherein he tells the jury that the positive evidence of one credible witness is entitled to more weight than the testimony of several witnesses who testify negatively or to collateral circumstances. In those jurisdictions wherein the judge is not prohibited by statute or organic law from instructing the jury with respect to matters of fact, nor from commenting on matters of fact, instructions with reference to the relative weight of positive and negative testimony, when properly qualified or limited to the facts of the case, are allowed, but, even in those jurisdictions, if the witnesses who testify positively and those who testify negatively have equal opportunities of seeing and hearing, the rule that posi-

tive evidence is the better must be so modified and explained as that the jury, if they so choose, may resolve the controversy in favor of the negative testimony. It is said in one case: .

"Evidence of a negative nature may, under particular circumstances, not only be equal, but superior to positive evidence. This must always depend upon the question whether the negative testimony can be attributed to inattention, error, or defect of memory, and whether the witnesses had equal means and opportunities for ascertaining the facts to which they testify and exercise the same. . . . It has been often held that it is not true, as a matter of law, that negative evidence may not be sufficient to overbalance positive testimony (citing authorities). In such cases, the jury or judge have to weigh, consider, and decide for themselves somewhat regardless of general rules." *State* v. *Chevallier,* 36 La. Ann. 81.

Blashfield's Instructions to Juries, section 337, says:

"In the jurisdictions where the statutory or organic provisions exist, prohibiting the trial court from expressing any opinion as to the weight of evidence, such an instruction is erroneous."

Our Constitution (section 12, article 6) provides:

"Judges shall not charge juries with respect to matters of fact nor comment thereon, but shall declare the law."

To tell the jury that positive evidence is stronger than negative evidence, or that the evidence of one witness may outweigh the evidence of several witnesses, is clearly a charge upon matters of fact and a comment thereon. It is a usurpation of the powers and duties of the jury. The court's duties are limited to a declaration of the law. When evidence has been admitted as competent and material in a case, it is the exclusive function of the jury to pass upon its weight and credibility. *Erickson* v. *State,* 14 Ariz. 253, 127 Pac. 754; *Lujan* v. *State,* 16 Ariz. 123, 141 Pac. 706; Blashfield's Instructions to Juries, § 116; 12 Cyc. 599–632; *Haun* v. *Rio Grande W. Ry. Co.,* 22 Utah, 346, 62 Pac. 908; *Russell* v. *Oregon R. & Nav. Co.,* 54 Or. 128, 102 Pac. 619.

4. Under the order of the court the jury was placed in charge of a sworn officer, whose duty it was "to keep the jurors together until the next meeting of the court, to suffer no

person to speak to them or communicate with them, nor to do so himself, on any subject connected with the trial." Section 1063, Penal Code 1913.

It is further provided that: "The jury shall also, at each adjournment of the court, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." Section 1064, Id.

Thus it will be seen that the law has provided by very strict rules that the jury shall not, after being sworn, receive any evidence outside of the court in the due course of the trial or be subject to any extrajudicial influences or suggestions whatever during the pendency of the case. Notwithstanding these precautions of the law, the jury was permitted to obtain on the last day of the trial, that had lasted six days, a copy of a newspaper, stating that one of the appellants had been guilty of a felony, to wit, embezzlement, and that he was saved from the penitentiary only because he made good on the cash taken. One of the jurors, it is shown, read the article aloud to all the other jurors. It was new matter, foreign to the issue on trial, and could not, by any rule of evidence, have been introduced before the jury. The natural and inevitable result, it would seem, of permitting such a charge to come before the jury without any opportunity to explain it away, even if it had been competent evidence, would be to influence and prejudice the jury against the appellants. They might well have reasoned that if the appellant, Phillips, was a common criminal, the probabilities were that he was guilty of the crime for which he was on trial.

While it is not a commendable practice to permit juries to read from newspapers detailed statements of the evidence when correctly reported, it is not apparent that any prejudice would be created in the minds of the jury against the defendant; therefore courts have uniformly refused to grant new trials by reason thereof. But where a newspaper report has departed from a fair and honest statement of the evidence and has interpolated facts derogatory to the defendant and likely to excite passion and prejudice on the part of the jury

against the defendant, the courts, as a general rule, have not hesitated to grant new trials. As was said in *Capps* v. *State,* 109 Ark. 193, Ann. Cas. 1915C, 957, 46 L. R. A. (N. S.) 741, 159 S. W. 193; quoting from *Styles* v. *State,* 129 Ga. 425, 12 Ann. Cas. 176, 59 S. E. 249.

"When a juror enters upon the trial of a criminal case, the law contemplates his withdrawal from the public, and makes no provision for addresses to him from outside sources, for his entertainment or otherwise, which are calculated, directly or indirectly, to excite any passions or emotions with respect to the matter upon which he is to sit in judgment. Perfect impartiality in the juror is the object of the law. Anything not legitimately arising out of the trial of the case, which tends to destroy the impartiality of the juror, should be discountenanced."

See, also, *United States* v. *Ogden* (D. C.), 105 Fed. 371; *State* v. *Tilden,* 27 Idaho, 262, 147 Pac. 1056; *People* v. *Stokes,* 103 Cal. 193, 42 Am. St. Rep. 102, 37 Pac. 207; *People* v. *Leary,* 105 Cal. 486, 39 Pac. 24; *People* v. *Chin Non,* 146 Cal. 561, 80 Pac. 681.

It is claimed by the respondent that the jury in this case could not have honestly or intelligently returned any other verdict than the one they did, and therefore this court should affirm the judgment. It is difficult for this court to say what the verdict of the jury might have been if they had been correctly instructed as to the law, or if they had not read the newspaper article complained of. The evidence consists of 800 pages of typewritten matter; we have read it sufficiently to discover that there is great conflict of testimony. We do not feel like assuming the functions of the jury and determining the weight of the testimony, especially in view of the palpable misdirection of the jury as to the law and the possible and indeed probable, prejudice and bias created in the minds of the jury against the appellants by reason of the very damaging statement contained in the newspaper.

Judgment of the lower court is reversed and cause remanded, with the directions that appellants be granted a new trial.

FRANKLIN, C. J., concurs.

XVIII Ariz.—33

CUNNINGHAM, J. (Concurring Specially).—I concur in the order granting the defendants a new trial. The specific reasons that control my opinion are that the third paragraph of the instructions of which complaint is made does invade the province of the jury. It is not the law that the positive testimony of one credible witness to a fact, which in the light of all other evidence in the case appears reasonable and believable is entitled to more weight than the testimony of several witnesses, equally credible, who testify negatively, or to collateral circumstances merely persuasive in their character, from which a negative may be inferred, as the court instructed the jury.

The law, supported by truth, reason and justice, is that positive testimony is to be believed rather than negative testimony; all other conditions being equal. *State* v. *Dorsey,* 40 La. Ann. 739, 5 South. 26; *State* v. *Murray,* 139 N. C. 540, 51 S. E. 775; *Wood* v. *State,* 9 Ga. App. 365, 71 S. E. 500; *Moon* v. *State,* 68 Ga. 687; *Henderson* v. *Crouse,* 52 N. C. 623. The rule does not, as a matter of law, require the jury to fasten their belief to positive testimony to the exclusion of negative testimony simply because one is positive in character, and reject negative testimony because it is negative in character, and disregard all other things that may appear to them as satisfying *indicia* of truth.

"The distinction between positive and negative testimony may be illustrated thus: It is positive to say that a thing did or did not happen; it is negative to say that a witness did not see or know of an event's having transpired." *McConnell* v. *State,* 67 Ga. 633.

"Where a witness testifies that he saw or heard a fact, this is positive evidence. Where another witness testifies that he was present and did not see or hear, or that the fact did not occur, this is strictly negative evidence, if nothing more appears, or if it appears that he was paying no particular attention at the time, even if the witness expresses the opinion that he would have seen or heard had the fact taken place. Having opportunity more or less adequate for correct observation, if he testifies that he was attentive, but did not see or hear his testimony, is commonly termed 'negative testimony,' but 'not of a purely negative character.' Under the same circumstances, however, if he testifies, not merely that he did not see or hear, but that the fact did not occur, it is clearly

positive testimony, though negative in form. Where a witness describes a fact observed by him and an opposing witness describes the same fact differently, the testimony of both is equally positive." 17 Cyc. 800, 801.

"The marked superiority of positive testimony is most commonly affirmed in those cases where the opposing testimony is what has been hereinbefore denominated 'strictly negative.' If there is evidence that the attention of a negative witness was specially directed to the fact, or it can be legitimately presumed or inferred that he was alert and would have observed had the fact occurred, his testimony that he did not see or hear is not necessarily weaker than opposing positive and affirmative testimony, and may indeed be entitled to more weight than the latter. Where witnesses testify positively to a fact and other witnesses absolutely deny it, the rule of comparative value as between positive and negative testimony does not apply, and the only question is to which side, under all the circumstances, credit is due." 17 Cyc. 802–804.

A brief reference to the testimony of some of the witnesses reveals the character of the testimony to which the instruction was intended to apply. Leon Phillips, testifying in behalf of the defendants, positively and unequivocally denied all of the material facts testified to by the witnesses for the prosecution. His evidence, so given, was therefore positive evidence in character, although tending to establish the negative of the proposition involved, that is, the defense of "not guilty." To such evidence, the instruction, if correct as an abstract exposition of the law, would not justly apply, yet in the absence of a definition of negative and positive evidence showing clearly the distinction between the two different characters of such two classes of evidence, the jury were very likely to have been misled in believing the instruction applied to all evidence tending to contradict the evidence given by the prosecution's witnesses.

The other character of negative evidence is shown by the testimony of Justice JACKSON, from the following question asked him, and his answer thereto, to wit:

"Q. If these defendants, or either of them, had had any other horses than those they were riding when you met them near Woolsey Tanks, would you have seen them? A. Yes; I would have."

This is in character what has been termed "strictly negative" evidence, and is truly a mere negative averment of the witness' opinion that a fact, theretofore testified to by another witness, did not occur, adding as an opinion that if it had occurred, this witness would have seen it—a mere negative inference. The positive testimony, when met by testimony of such character, that is, of mere negative averments, is entitled to outweigh such averments, because such averments are not testimony at all.

If the instruction had been limited by the court to such averments in the testimony, no harm could follow, but it was not so limited. In the first place the court did not define the meaning of positive and negative testimony, and, in the next place, the court made the instruction apply also to all testimony "to collateral circumstances merely persuasive in their character from which a negative may be inferred." This clearly applies the rule to all positive testimony which tends to establish the negative of every contested question, including the issue of guilt or innocence of the defendants under the charge. To illustrate: If in a supposed case the defendants introduce positive testimony to the fact that they were absent from the place of a crime with which they are charged, and were present at a place distant therefrom when a crime was committed, such evidence is evidence of a collateral circumstance merely persuasive in character, from which a negative, not guilty, may be inferred, yet the instruction tells the jury that such evidence is negative in character, and for that reason is outweighed by positive evidence; that is, by evidence tending to establish the affirmative of the issue.

Such is not the law of evidence, and, if recognized as such, would have the effect of abrogating all defenses in criminal trials. If the jury gave the least effect to the instruction, they must have considered that the testimony, where conflicting, must be resolved in favor of the state's testimony, regardless of the number of witnesses, or of the other surrounding circumstances proven otherwise. The defendants have not therefore been awarded a fair trial or convicted by due process of law, and the judgment of conviction must be reversed and a new trial granted.

I think the other instructions assigned as error fail to state the law, but, in each instance, when carefully examined, state the law as more favorable to the defendants than they are

entitled. The prosecution, and not the defendants, suffered injury, if injury resulted therefrom. The defendants were on trial for grand larceny. Their witnesses may have testified falsely, but through accident or mistake or some cause other than corrupt perjury, yet their testimony was false and not believable for that reason. I do not concur in holding that the jury, in reading a false statement purporting to be the evidence printed in a newspaper, are guilty of misconduct of such character as would invalidate their verdict. The duty of the jury is to determine under the instructions of the court what evidence is before them. All the parties concede that no evidence was before the jury of the nature and kind referred to in the newspaper article; that the newspaper statement of what evidence was before the jury, all parties concede was a false statement. I am of the opinion that, as the jury were acting under oath, extending to all of the evidence produced in the case, being fairly intelligent men, they would be as apt to know that the statement made in the newspaper article was a false statement as the parties, their attorneys, and the trial judge would know it was false. The newspaper management may have been guilty of gross misconduct in publishing a false statement and report of the trial, but the jury ought not to be condemned as for misconduct committed by another.

---

Juror in criminal case reading newspaper account of trial as ground for new trial, see note in 46 L. R. A. (N. S.) 741.

On the question as to whether an instruction that a witness is presumed to speak the truth invades the province of the jury, see note in 14 L. R. A. (N. S.) 947.